UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| Powerlift Door Consultants, Inc., *a South Dakota corporation*, | Case No. 21-cv-1316 (WMW/ECW) |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Lynn Shepard, *an individual*, et al., | |
| Defendants. | |

---

This matter is before the Court on Plaintiff Powerlift Door Consultants, Inc.'s (Powerlift's) motion for a temporary restraining order, preliminary injunctive relief and expedited discovery against Defendants Lynn Shepard, Rearden Steel Manufacturing LLC, Rearden Steel Inc. and ABC Corporation. (Dkt. 6.) For the reasons addressed below, Powerlift's motion is granted in part and denied in part.

## BACKGROUND

Powerlift is a South Dakota corporation operating in the hydraulic-lift-door industry and owns associated trademarks. Shepard is the owner and operator of Rearden Steel Manufacturing LLC (Rearden), a Powerlift licensee.[1] Rearden operates under the business name Powerlift Hydraulic Doors of Florida and is located in Fort Pierce, Florida. In 2014, Shepard, on behalf of Rearden, entered into a distribution agreement with Powerlift

---

[1] The complaint alleges that Defendants Rearden Steel Inc. and ABC Corporation are fictitious designations used by Shepard when operating as a Powerlift licensee. The Court will refer to the corporate defendants collectively as "Rearden" unless otherwise noted.

(Distribution Agreement). Powerlift alleges that on April 23, 2021, Shepard sent an ephemeral, self-destructing email to at least 12 Powerlift licensees across the United States, seeking support for a plan to fix what Shepard considers to be corporate- and product-related issues with Powerlift. Among other "Demands," Shepard's email expresses a desire to change Powerlift's corporate structure from a licensee-based to a franchise-based system.

Powerlift commenced this breach-of-contract and trademark-infringement action against Defendants on June 1, 2021. Powerlift's complaint alleges that Defendants breached the parties' 2014 Distribution Agreement and that Defendants are improperly using Powerlift's trademarks and confidential information. Powerlift brings 10 claims for relief. Powerlift's first and second claims seek a declaratory judgment under federal and state law. *See* 28 U.S.C. § 2201; Minn. Stat. §§ 555 *et seq*. Powerlift's third claim for relief alleges that Defendants breached the Distribution Agreement. Powerlift's fourth claim alleges that Defendants are misappropriating trade secrets, in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq*. Powerlift's fifth claim alleges that Defendants are violating the Minnesota Uniform Trade Secrets Act (MUTSA), Minn. Stat. §§ 325C.01(a) *et seq*. Powerlift's sixth claim alleges that Defendants are engaging in unfair competition, in violation of 15 U.S.C. § 1125(a), by using Powerlift's trademarks to sell hydraulic lift doors. Powerlift's seventh claim alleges that Defendants are falsely advertising that they are affiliated with Powerlift, in violation of 15 U.S.C. § 1125(a). Powerlift's eighth claim alleges that Defendants are engaging in trademark infringement,

in violation of 15 U.S.C. § 1114(1), by continuing to use Powerlift's trademarks. Powerlift's ninth claim alleges that Defendants are engaging in trademark infringement in violation of Minnesota law, *see* Minn. Stat. § 333.28, by improperly using Powerlift's trademarks in a way that is likely to deceive the public as to the nature of Defendants' and Powerlift's relationship. Finally, Powerlift's tenth claim alleges that Defendants are engaging in trademark dilution, in violation of Minn. Stat. § 333.285, by using Powerlift's trademarks in the advertising and sale of products.

Powerlift moves for a temporary restraining order, preliminary injunctive relief and expedited discovery. Powerlift seeks to enjoin Defendants from using Powerlift's trademarks and confidential information and to enforce the terms of the parties' Distribution Agreement, including its non-competition provisions.

## ANALYSIS

Federal Rule of Civil Procedure 65 authorizes a district court to grant injunctive relief in the form of a preliminary injunction or temporary restraining order. When determining whether preliminary injunctive relief is warranted, a district court considers the four *Dataphase* factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that an injunction would inflict on other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "A preliminary injunction is an extraordinary remedy," and the party seeking injunctive relief bears the burden of establishing that each factor favors granting such relief. *Roudachevski v. All-*

*Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). The core question in this analysis "is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

Powerlift moves for both a temporary restraining order and preliminary injunctive relief. The legal standards for a temporary restraining order and a preliminary injunction are the same. See *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989); *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1031 (N.D. Iowa 2008) ("As this court has explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the same factors, which were set forth in the seminal decision in *Dataphase* . . . ."). A court "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Defendants filed a response and were heard at the June 16, 2021 hearing. Accordingly, this Court will consider whether a preliminary injunction is warranted.

### I. Likelihood of Success on the Merits

In deciding whether to grant a preliminary injunction, the "likelihood of success on the merits is most significant." *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992). The moving party need not "prove a greater than fifty per cent likelihood that [it] will prevail on the merits," *Dataphase*, 640 F.2d at 113, rather the moving party must demonstrate a "fair chance of prevailing," *Paisley Park Enters. v. Boxill*, 253 F. Supp.

3d 1037, 1043 (D. Minn. 2017) (internal quotations marks omitted). Here, Powerlift contends that it is likely to succeed on the merits of its breach-of-contract and trademark claims. Powerlift's likelihood of success as to each claim is addressed in turn.

### A. Breach-of-Contract Claim

The Court first considers whether Powerlift has a likelihood of success on the merits of its breach-of-contract claim.

"Under Minnesota law, a breach-of-contract claim has four elements: (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Nelson v. Am. Fam. Mut. Ins. Co.*, 899 F.3d 475, 480 (8th Cir. 2018). Defendants argue that (1) Powerlift did not validly terminate the Distribution Agreement, and (2) the Distribution Agreement's non-competition clause is unenforceable. Powerlift disagrees.

#### 1. Termination

As an initial matter, Defendants maintain that Powerlift lacked grounds for terminating the Distribution Agreement and, because all of Powerlift's claims are premised on a valid termination of the Distribution Agreement, all of Powerlift's claims fail. Powerlift counters that it properly terminated the Distribution Agreement. Specifically, Powerlift argues that it terminated the Distribution Agreement because Defendants voluntarily abandoned it. Powerlift also argues that it properly terminated the Distribution Agreement because some of Defendants' statements in the April 23, 2021 email violated Article 3.A. of the Distribution Agreement. Finally, Powerlift argues that it had the right

5

to terminate the Distribution Agreement after providing 30 days' notice under Articles 11.B.1. and 11.C. for Defendants' failure to follow the terms of the Distribution Agreement.

Powerlift first contends that Defendants abandoned or repudiated the Distribution Agreement. Defendants disagree. The parties cite no legal authority to support their respective positions.

"It is basic hornbook law that an unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed by the contract for his [or her] performance constitutes an anticipatory breach." *In re Haugen*, 278 N.W.2d 75, 79 n.6 (Minn. 1979) (addressing repudiation in real estate context). "A repudiation by one party to a contract if acquiesced in by the other party is tantamount to a recission." *Desnick v. Mast*, 249 N.W.2d 878, 884 (Minn. 1976). "Whether a contract has been rescinded by mutual consent is a question for the trier of fact, but mutual abandonment, cancellation or recission must be clearly expressed, and acts and conduct of the parties to be sufficient must be positive, unequivocal, and inconsistent with the existence of the contract." *Id.* Contractual intent is based on objective manifestation of words and acts, not subjective intent. *Minn. Ltd., Inc. v. Public Utils. Comm'n of Hibbing*, 208 N.W.2d 284, 287 (Minn. 1973).

Here, Shepard's April 23, 2021 email expresses discontent with various aspects of Powerlift's products and Powerlift's corporate management. And Shepard's April 23, 2021 email provides that the Distribution Agreements "are [n]ull and [v]oid." Shepard's

6

email does not constitute a repudiation of the Distribution Agreement for at least two reasons, however. First, Shepard did not communicate this alleged repudiation to Powerlift. *See Haugen*, 278 N.W.2d at 79 n.6 (describing repudiation as "communicated to the other party" to the contract). Second, the "[n]ull and [v]oid" language appears under the section of the April 23, 2021 email titled "Demands to Rectify." It appears, therefore, that Shepard sought support from other licensees in renegotiating the terms of the Distribution Agreements. But this solicitation does not clearly and unequivocally repudiate the Distribution Agreement. For these reasons, Shepard's April 23, 2021 email did not repudiate the Distribution Agreement.

Powerlift next argues that Defendants' actions violated Article 3.A. of the Distribution Agreement. Defendants' briefing does not address this argument.

Article 3.A. of the Distribution Agreement provides that Defendants "may not, during or after the term of this Agreement, engage in any conduct directly or indirectly that would infringe upon, harm or contest [Powerlift's] rights in any of [Powerlift's trademarks] or the goodwill associated with [Powerlift's trademarks], including any use of [Powerlift's trademarks] in a derogatory, negative, or other inappropriate manner in any media, including but not limited to print or electronic media."

Here, Shepard's April 23, 2021 email included several negative statements about Powerlift and Powerlift's products, including allegations that some Powerlift products were "Defective" and made with "Poor Quality Materials" and that Powerlift had "[n]o warranty accountability." Shepard's email also accuses Powerlift of stealing customer

7

website leads. Sending an email with such statements constitutes conduct that could, either directly or indirectly, harm or contest the goodwill associated with Powerlift's trademarks. And, under Article 11.B.3. of the Distribution Agreement, "[i]n the event that a default under [the Distribution Agreement] occurs that materially impairs the goodwill associated with any of [Powerlift's trademarks]," Powerlift can terminate the Distribution Agreement with 24-hours' notice. Powerlift maintains that Defendants' negative statements about Powerlift and its products have materially harmed Powerlift's reputation and disrupted its business. The record provides, and Defendants do not contest, that Powerlift provided 24-hours' notice prior to terminating the Distribution Agreement.

Therefore, Powerlift has a fair chance of prevailing on its claim that its termination of the Distribution Agreement was valid.[2]

### 2. Non-Competition Clause

Defendants argue that the Distribution Agreement's three-year non-competition clause is unenforceable. Powerlift argues that the non-competition agreement is valid and enforceable.

"Under Minnesota law, a non-competition agreement is enforceable if, (1) consideration exists for signing the agreement, (2) the restriction is reasonable, and (3) the legitimate interest of the plaintiff is greater than that of the defendant." *Ikon Off. Sols., Inc. v. Dale*, 170 F. Supp. 2d 892, 895 (D. Minn. 2001); *see also Davies & Davies*

---

[2] In light of this conclusion, the Court need not consider whether Powerlift also had grounds to terminate the agreement pursuant to Articles 11.B.1. and 11.C.

8

*Agency, Inc. v. Davies*, 298 N.W.2d 127, 131 n.1 (Minn. 1980) (discussing Minnesota's adoption of the "blue pencil doctrine"). Defendants urge this Court to apply Minnesota's "blue-pencil" doctrine and modify the non-competition period from three years to three months. In doing so, Defendants appear to challenge the reasonableness of the duration of the Distribution Agreement's non-competition clause.

"In Minnesota, the reasonableness of the duration of a restrictive covenant may be tested under two alternative standards: (1) the length necessary to obliterate the identification between employer and employee in the minds of the employer's customers, and (2) the length of time necessary for an employee's replacement to obtain licenses and learn the fundamentals of the business." *Dean Van Horn Consulting Assocs., Inc. v. Wold*, 395 N.W.2d 405, 408–09 (Minn. Ct. App. 1986) (citing *Davies*, 298 N.W.2d at 131).

Powerlift maintains that a three-year restrictive period is necessary because Defendants have operated as Powerlift licensees since 2014 and have built a customer base using Powerlift's trademarks and confidential information. According to Powerlift, time is needed to separate customers' association of Defendants with the Powerlift brand. In addition, Defendants rely on the email from Shepard as proof that Defendants intend to compete with Powerlift and to encourage other licensees to act similarly. Although Defendants argue that three years is "too restrictive," Defendants provide neither an argument as to *why* three years is too restrictive here nor any reason why a three-month restriction would be appropriately tailored to the facts at issue. Therefore, the Court declines to modify the term of Defendants' non-competition agreement.

Turning to the breach-of-contract claim itself, the allegations in Powerlift's complaint demonstrate that Powerlift has a fair chance of prevailing on the merits of this claim. *See Nelson*, 899 F.3d at 480. First, it is undisputed that a contract was formed, namely, the Distribution Agreement. Second, no party identifies conditions precedent that Powerlift failed to perform. Third, Powerlift alleges that Defendants breached Articles 3, 6, 9.C., and 12.A. of the Distribution Agreement by, among other things, continuing to use Powerlift's trademarks and confidential information, violating the non-competition provision, and failing to comply with post-termination obligations. Although Defendants dispute whether the Distribution Agreement was properly terminated, Defendants do not otherwise argue that their actions do not breach the provisions of the Distribution Agreement identified in the complaint. Finally, the complaint alleges that, as a result of Defendants' conduct, Powerlift has suffered damages.[3]

Accordingly, Powerlift has a fair chance of prevailing on its breach-of-contract claim.

B.  **Trademark Claims**

Powerlift asserts a federal trademark-infringement claim pursuant to the Lanham Act, 15 U.S.C. § 1114(1). To establish a claim for federal trademark infringement, Powerlift must show that: (1) it has a valid, protectable trademark; and (2) the unauthorized

---

[3] Defendants argue that the Distribution Agreement was not properly terminated and, therefore, any possible harm suffered by Powerlift is "purely speculative." As addressed above, however, Powerlift has demonstrated a fair chance of prevailing as to the issue of whether it validly terminated the Distribution Agreement.

use of that trademark creates a likelihood of confusion. *See Davis v. Walt Disney Co.*, 393 F. Supp. 2d 839, 843 (D. Minn. 2005). Powerlift also brings similar claims under Minn. Stat. § 333.28, which has a similar legal standard. *See Minneapple Co. v. Normandin*, 338 N.W.2d 18, 22 n.5 (Minn. 1983) (discussing similarities between Minnesota's trademark statutes and federal Lantham Act). The Court addresses each element in turn.

1. **Valid and Protectable Trademark**

Powerlift contends that its trademark registrations constitute *prima facie* evidence of the validity of the registrations and Powerlift's ownership of the trademarks. Defendants do not contest the validity of the trademark registrations or that Powerlift owns the trademarks.

After a trademark is registered with the United States Patent and Trademark Office (USPTO) and the mark has become incontestable, "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). To make a trademark "incontestable," after registration, the owner of the mark must have used the mark continuously for five consecutive years and have filed an affidavit of incontestability with the USPTO within one year after any five-year period of continuous use. 15 U.S.C. § 1065. Powerlift has

provided persuasive allegations and evidence in support of its representation that the mark registered under federal registration number 3994263 is incontestable.[4]

Accordingly, Powerlift is likely to establish that it has valid and protectable trademarks, the first element of its federal trademark-infringement claim.

### 2. Unauthorized Use that Creates a Likelihood of Confusion

The second element of a federal trademark-infringement claim is that the unauthorized use creates a likelihood of confusion among consumers. Powerlift alleges that Defendants' use of Powerlift's trademarks creates a likelihood of confusion among consumers. Defendants present no argument in response to this allegation.

Courts consider six factors to determine whether a likelihood of confusion exists: "(1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to 'pass off' its goods as the trademark owner's; (5) incidents of actual confusion; and, (6) the type of product, its cost, and conditions of purchase." *Everest Cap. Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759–60 (8th Cir. 2005). Numerous courts have recognized that "continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark

---

[4] Powerlift's trademark bearing federal registration number 5612680 was issued on November 20, 2018, and therefore Powerlift has not yet been able to file an affidavit of incontestability as to this trademark. *See* 15 U.S.C. § 1065 (requiring five years of continuous use in order to be able to file affidavit of incontestability). However, Defendants do not dispute that either of Powerlift's marks are valid and protectable trademarks.

infringement." *See, e.g.*, *Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983) (citing *U.S. Jaycees v. Phila. Jaycees*, 639 F.2d 134 (3d Cir. 1981)); *see also Nw. Airlines, Inc. v. NWA Fed. Credit Union*, No. Civ. 03-3625DWFSRN, 2004 WL 1968662, at *6 (D. Minn. Sept. 2, 2004) (citing same standard).

Here, Defendants do not contest Powerlift's assertions that Defendants are continuing to use Powerlift's trademarks after the termination of the Distribution Agreement, which granted Defendants a trademark license. Therefore, Powerlift is likely to establish that a likelihood of confusion exists.

In summary, Powerlift is likely to succeed on at least one of its trademark-infringement claims.

## II. Irreparable Harm

The second *Dataphase* factor is the threat of irreparable harm. Powerlift contends that it will be irreparably harmed absent an injunction. In particular, Powerlift argues that its reputation and goodwill will be harmed if Defendants are not enjoined from selling products that Defendants continue to represent are affiliated with Powerlift and that the threat of consumer confusion exists if Defendants are not enjoined from using Powerlift's trademarks and otherwise required to comply with Defendants' post-termination obligations under the Distribution Agreement.[5]

---

[5] Although Defendants argue that issuing a preliminary injunction based only on the possibility of irreparable harm is improper, as addressed above, Powerlift has established a likelihood of success on the merits on at least one of its alleged claims.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Because it is difficult to quantify, the loss of intangible assets such as reputation and goodwill can constitute irreparable injury. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). In a trademark-infringement action, "a finding that likelihood of confusion exists results in a presumption that a threat of irreparable harm exists." *Warner Bros. Entm't v. X One X Prods.*, 840 F.3d 971, 982 (8th Cir. 2016).

Defendants' sale of Powerlift-trademarked goods without authorization to use the trademarks risks irreparable harm to Powerlift's goodwill and reputation. *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987) ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [the trademark owner] can demonstrate a likelihood of consumer confusion."). By establishing a likelihood that it will succeed in proving likelihood of consumer confusion, *see* Part I.B. *supra*, Powerlift has established a presumption that it will suffer irreparable harm. *See Warner Bros.*, 840 F.3d at 982.

Defendants' argument that injuries such as loss of consumer goodwill can be addressed through money damages is unavailing. In *Novus Franchising, Inc. v. Dawson*, on which Defendants rely, the Eighth Circuit questioned whether injuries such as a loss of customers or customer goodwill are truly irreparable in the sense that they cannot be addressed through money damages. 725 F.3d 885, 895 (8th Cir. 2013); *cf. Gen. Motors*

*Corp.*, 563 F.3d at 319 (concluding that a district court did not clearly err in finding that the harm from lost customer relationships is equivalent to a claim of lost profits, which can be compensated through money damages); *but see Med. Shoppe Int'l*, 336 F.3d at 805 (loss of goodwill constitutes irreparable injury). But, because Powerlift has demonstrated that it will suffer irreparable harm in the form of consumer confusion, and Defendants have presented no argument to successfully rebut this presumption, this Court need not determine whether a loss of customer relationships or goodwill is truly irreparable.

For these reasons, the irreparable-harm *Dataphase* factor weighs in favor of granting Powerlift's request for preliminary injunctive relief.

### III. Balance of Harms

Powerlift contends that the balance-of-harms factor weighs in favor of granting Powerlift a preliminary injunction. Defendants disagree.

This *Dataphase* factor requires the Court to weigh the irreparable harm to Powerlift against the injury a preliminary injunction would cause Defendants. *Dataphase*, 640 F.2d at 114. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l, Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587–88 (D.D.C. 1994).

Powerlift argues that, absent an injunction, it will suffer irreparable harm in the form of loss of goodwill, damage to its business through customer confusion, and infringement of its protected trademarks. Defendants argue that an injunction would put Defendants out of business and terminate the employment of Defendants' 15 employees, would cause

Shepard to fail to perform on 30 active contracts, and would cause Shepard to default on multiple business loans and two mortgages. The harms that Defendants may experience, however, are self-inflicted. *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 846 (D. Minn. 2011) (declining to acknowledge that an injunction will pose any harm to defendants in a trademark-infringement action because "[d]efendants have indeed brought this harm upon themselves through their non-payment and infringement"). And Powerlift represents that it is prepared to fulfill Defendants' active contracts, pursuant to the terms of the Distribution Agreement.[6]

The balance-of-harms *Dataphase* factor weighs in favor of granting Powerlift's request for preliminary injunctive relief.

### IV. Public Interest

According to Powerlift, preliminary injunctive relief would serve the public's interest, the fourth *Dataphase* factor. Defendants respond, without explanation, that the public interest does not favor "an abuse of power."

When, as here, a plaintiff has demonstrated a likelihood of success on a trademark-infringement claim, there is a presumption that "[t]he public interest weighs in favor of protecting consumers against trademark infringement." *J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 689 (D. Minn. 2007). The public has an

---

[6] At the June 16, 2021 hearing, Defendants disputed Powerlift's ability to fulfill the 30 active contracts. But Defendants provided no substantive basis for this dispute.

interest in not being confused as to the origin, sponsorship, or approval of a trademark.  *See Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 776 (8th Cir. 1994).

As Powerlift has demonstrated a likelihood of success on its trademark-infringement claims against Defendants, a presumption exists that it is in the public's interest to grant Powerlift preliminary injunctive relief.  *See J & B Wholesale*, 621 F. Supp. 2d at 689.  Accordingly, the public-interest *Dataphase* factor weighs in favor of granting Powerlift's request for preliminary injunctive relief.

In conclusion, because each *Dataphase* factor supports granting Powerlift's motion for preliminary injunctive relief, the Court grants Powerlift's motion.

## V. Rule 65 Bond Requirement

Having concluded that preliminary injunctive relief is warranted, the Court must determine whether to require Powerlift to post a bond as security for the effects of the injunction on Defendants.  Powerlift argues that it should not be required to post a bond or that any bond imposed should be nominal.  Defendants argue that the Court should set a "significant" bond if injunctive relief is granted.

The bond requirement to secure injunctive relief "is a security device, not a limit on the damages the . . . defendant[] may obtain against [the plaintiff] if the facts warrant such an award."  *Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997).  Rule 65(c) of the Federal Rules of Civil Procedure provides, in pertinent part:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages

>   sustained by any party found to have been wrongfully enjoined
>   or restrained.

Fed. R. Civ. P. 65(c). District courts have broad discretion in setting a bond, but a district court abuses that discretion if it acts with an improper purpose, fails to require an adequate bond, or fails to make the necessary findings to support its decision. *See Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). Although a district court must expressly consider whether to require a bond, a district court is not required to impose one. *See Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989). The party seeking the bond must establish a rational basis for the amount of the proposed bond. *In re President Casinos, Inc.*, 360 B.R. 262, 266 (B.A.P. 8th Cir. 2007).

Here, although Defendants seek a "substantial" bond, Defendants neither request a specific amount nor establish a rational basis for their vague request.[7] For this reason, Powerlift is not required to post a bond to secure injunctive relief.

## VI. Expedited Discovery

Finally, Powerlift seeks expedited discovery, pursuant to Rule 26(d)(1), Fed. R. Civ. P. Defendants present no argument addressing this issue.

Although the standard for granting a motion for expedited discovery has not been articulated by the Eighth Circuit, courts often utilize a "good cause" standard. *See, e.g., Let Them Play MN v. Walz*, __ F. Supp. 3d __, 2021 WL 423923, at *13 (D. Minn. Feb. 8,

---

[7] At the June 16, 2021 hearing, Defendants for the first time requested a $1 million bond and vaguely referenced alleged harms that they might experience. Without more, the Court cannot determine whether there is a rational basis for this request based on these unspecified allegations of future harm.

2021). To establish that good cause exists, the party requesting expedited discovery must show that the need for expedited discovery, in light of the administration of justice, outweighs any prejudice to the responding party. *Council on Am.-Islamic Relations—Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 380 (D. Minn. 2020).

Here, Powerlift maintains that good cause exists because Defendants have used ephemeral communication methods and there is a serious risk that the evidence relevant to this case will "self-destruct." But Powerlift's discovery request is extremely broad. *See Let Them Play*, 2021 WL 423923, at *13–14 (discussing one of the purposes of expedited discovery is allowing a party to obtain specific, limited and identifiable pieces of information, particularly when there is a risk of spoliation). And because this Court jointly heard Powerlift's request for a temporary restraining order and a preliminary injunction, there is no risk of Powerlift not having relevant evidence in time for a preliminary-injunction hearing. *Id.* (addressing the potential need for expedited discovery before a preliminary-injunction hearing). The purpose of expedited discovery is not to begin discovery ahead of schedule. *Id.* However, Powerlift has demonstrated good cause for expedited discovery as there is a risk that the communications Powerlift seeks may be destroyed.

For these reasons, Powerlift's request for expedited discovery is granted in part and denied in part. Powerlift is authorized to begin expedited discovery *only* as to communications that may self-destruct.

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiff Powerlift Door Consultants, Inc.'s motion for a temporary restraining order and a preliminary injunction, (Dkt. 6), is **GRANTED** in the form of a preliminary injunction.

2. Defendants Lynn Shepard, Rearden Steel Manufacturing LLC, and Rearden Steel Inc., as well as all other officers, directors, members, shareholders, agents, employees and persons acting in concert with them, who receive actual notice of this Order, are hereby **ENJOINED** from using Powerlift's trademarks, including the trademarks registered as numbers 3994263 and 5612680 with the United States Patent and Trademark Office.

3. Defendants shall comply fully with their post-termination obligations in Articles 9.C. and 12.A. of the Distribution Agreement between the parties.

4. Powerlift's motion for expedited discovery, (Dkt. 6), is **GRANTED IN PART AND DENIED IN PART**. Powerlift may begin expedited discovery only as to communications that may self-destruct.

5. This preliminary injunction shall remain in effect until further order of the Court.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 12, 2021                            s/Wilhelmina M. Wright
                                                Wilhelmina M. Wright
                                                United States District Judge